# United States Court of Federal Claims

No. 07-150 C
Filed May 16, 2007
Reissued May 31, 2007*
TO BE PUBLISHED

| | |
|---|---|
| HERITAGE OF AMERICA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>DYNAMIC SYSTEMS TECHNOLOGY, INC.<br><br>and EVOLVER, INC.,<br><br>Defendant-Intervenors. | Post-award bid protest; jurisdiction; Tucker Act, 28 U.S.C. § 1491(b); Administrative Procedure Act, 5 U.S.C. § 706; arbitrary, capricious, abuse of discretion, or otherwise not in accordance with law; rational basis; violation of regulation or procedure; prejudice; timeliness; ambiguity; GAO timeliness requirements; laches; "zone of reasonableness"; solicitation; permanent injunction; success on the merits; irreparable harm; balance of hardships; public interest; base year; option years |

Ross L. Crown, Lewis and Roca Jontz Dawe, LLP, Albuquerque, New Mexico, for plaintiff.

Brian T. Edmunds, Trial Attorney, Kathryn A. Bleecker, Assistant Director, Jeanne E. Davidson, Director, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. Christinalynn E. McCoy, U.S. Army, Arlington, Virginia, of counsel.

---

* This Opinion and Order was originally filed under seal on May 16, 2007, pursuant to the protective order entered in this action on March 9, 2007. The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted under the terms of the protective order. The parties filed a joint report (docket entry 47) on May 30, 2007, proposing minor redactions, which the Court has adopted. Accordingly, the Court is reissuing its Opinion and Order dated May 16, 2007, with the agreed redactions indicated by three consecutive asterisks.

Janice Davis, Davis & Steele, Washington, D.C., for defendant-intervenor Dynamic Systems Technology, Inc.

Andrew B. Golkow, Rees, Broome & Diaz, P.C., Vienna, Virginia, for defendant-intervenor Evolver, Inc.

**OPINION AND ORDER**

GEORGE W. MILLER, Judge.

This matter is before the Court on plaintiff's motion for judgment on the administrative record[1] ("Pl.'s Mot.," docket entry 8) filed March 8, 2007, defendant's cross-motion for judgment on the administrative record ("Def.'s Cross-Mot.," docket entry 36) filed April 12, 2007, defendant-intervenor Dynamic Systems Technology, Inc.'s ("Dynamic") cross-motion for judgment on the administrative record ("Dynamic's Cross-Mot.," docket entry 33) filed April 12, 2007, and defendant intervenor Evolver, Inc.'s ("Evolver," and together with Dynamic, "intervenors," and together with Dynamic and the Government, "defendants") cross-motion for judgment on the administrative record ("Evolver's Cross-Mot.," docket entry 34) filed April 12, 2007. Evolver also filed a motion for leave to submit extra-record evidence (docket entry 35) on April 12, 2007, to which no opposition has been filed. Plaintiff filed its consolidated reply ("Pl.'s Reply," docket entry 38) on April 26, 2007. Defendant filed its reply ("Def.'s Reply," docket entry 41), as did Evolver ("Evolver's Reply," docket entry 42) and Dynamic ("Dynamic's Reply," docket entry 43) on May 3, 2007. The Court held a hearing on the motion and cross-motions on May 7, 2007.

The Court ORDERS that Evolver's motion for leave to submit extra-record evidence is GRANTED. Nonetheless, for the reasons set forth below, the Court grants plaintiff's motion for judgment on the administrative record and denies defendants' cross-motions.

***BACKGROUND***

On June 26, 2006, the Contracting Center for Excellence, Army Contracting Agency ("CCE-ACA") issued Solicitation No. W74V8H-06-R-0044 ("Solicitation") for support services for the Army Continuing Education System ("ACES"). Administrative Record ("AR") 2, 1836. As part of the ACES program, contractors provide "non-personal educational support services to assist Government professionals in the delivery of adult education services" at over forty-five Army installations in the contiguous United States, as well as a number of sites outside of the

---

[1] Docket entry 8 is titled "Application for Preliminary Injunction." In its order filed March 9, 2007 (docket entry 9), after discussing the matter with plaintiff and defendant, and with their consent, the Court stated that it would treat plaintiff's Application For Preliminary Injunction as a motion for judgment on the administrative record pursuant to Rule 52.1(b) of the Rules of the United States Court of Federal Claims ("RCFC"). *Cf.* RCFC 65(a)(2).

continental United States.  *Id.*  The Solicitation stated that the support services would include (1) reception/administrative services, (2) counseling support services, (3) counseling services, (4) facilities administration services, (5) automation and technology support services, (6) test examiner services, (7) test proctor services, (8) test control officer for Army personnel testing services, (9) instruction services, (10) multi-use learning facility support services, and (11) educational programming services.  *Id.*

On August 4, 2006, the CCE-ACA issued Amendment No. 0001, which replaced the original solicitation in its entirety.  *Id.* at 1.  On August 11, 2006, the CCE-ACA issued Amendment No. 0002, which replaced data in sections B, L, and M.  *Id.* at 373.  On August 17, 2006, the CCE-ACA issued Amendment No. 0003, which, among other things, made changes to section M.  *Id.* at 425.

The Solicitation provided that awards would be made to the offeror(s) whose proposal(s) presented the best value to the Government.  In order to determine which offeror(s) presented the best value, the CCE-ACA stated that it would evaluate the each offeror's technical capability, past performance, and cost/price.  The Solicitation explained that "Technical Capability is significantly more important than Past Performance, and Past Performance is significantly more important than Cost/Price.  Technical Capability and Past Performance when combined are significantly more important than Cost/Price."  *Id.* at 455.  Where non-price factors were nearly the same, however, the Solicitation stated that best value could be represented by the lowest-priced offer.  *Id.* at 456.

The Government anticipated awarding multiple Indefinite Delivery, Indefinite Quantity Labor Hours Contracts, each of which would be for one base year with four one-year option periods.  *Id.* at 2.  The contracts were to be awarded by region, with a maximum of two contracts awarded for each region.  *Id.* at 367–68.  In order to be considered for a region, an offeror was required to submit a proposal for at least "75% of the services required in the regions listed in Technical Exhibit 3."  *Id.* at 368, 417, 419, 422, 423.  Offerors were to submit a pricing proposal that included proposed prices for the base year as well as for each of four option years.  *Id.* at 362.

The Government received fifteen different proposals from thirteen offerors.  *Id.* at 1720–24.  Plaintiff received an "Excellent" rating on technical capability, the highest rating possible, as did intervenors.  *Id.* at 1706, 1709, 1712.  Plaintiff and intervenors each received a "Low Risk" rating, the best rating possible, on past performance.  *Id.* at 1714, 1717, 1719.  Plaintiff had the lowest bid of any offeror for the Northwest and the Southwest regions, *id.* at 1724, and in the Pacific region Serrato Corporation had the lowest bid, while plaintiff had the second-lowest bid.  *Id.* at 1722–23.  Ultimately, the CCE-ACA awarded Evolver the contracts for

the Northwest and Pacific[2] regions, and awarded Dynamic the contract for the Southwest region. *Id.* at 1732.

On September 22, 2006, the CCE-ACA informed plaintiff by email that it had not been awarded a contract, and also informed plaintiff of the winning offerors. *Id.* at 1735. That same day, plaintiff requested a post-award debriefing. *Id.* at 1737. Plaintiff received a written debriefing on October 10, 2006. *Id.* at 1739.

Plaintiff filed an agency protest on October 13, 2006. *Id.* at 1781. In its agency protest, plaintiff alleged five reasons its protest should be sustained: (1) it did not receive preferential evaluation points as a service-disabled veteran-owned small business; (2) in spite of the CCE-ACA's assertion in the debriefing slides to the contrary, plaintiff did specify program managers and alternates in conformance with the Solicitation; (3) the CCE-ACA did not respond to its request for debriefing in a timely manner; (4) the debriefing did not fully respond to its request; and (5) inasmuch as it appeared equal to the awardees in all technical and other respects, plaintiff should have been awarded the contracts based on its having offered the lowest price. *Id.*

On October 17, 2006, plaintiff filed a protest at the Government Accountability Office ("GAO"), making essentially the same allegations. *Id.* at 1832. On November 16, 2006, the Army filed an agency report responding to plaintiff's allegations and stating that plaintiff was not awarded contracts in the Northwest, Southwest, and Pacific regions, and, in fact, was ineligible for award, because "it did not propose on at least 75% of the services in each region, as required in the Solicitation." *Id.* at 1840–54.

On November 21, 2006, plaintiff requested and the GAO granted plaintiff a one-day extension of the deadline by which its comments on the agency report were due, from November 27, 2006, to November 28, 2006. *Id.* at 1855. Plaintiff filed its comments on the agency report on November 28, 2006, in which it responded to the Army's assertion that it had failed to bid on at least 75 percent of the services required in each region, explaining that it had bid on more than 75 percent of the estimated labor hours in each region. *Id.* at 1862–63. Plaintiff argued that if the Army interpreted the 75 percent requirement to mean something different, then the Solicitation was, at a minimum, ambiguous, and plaintiff's interpretation was reasonable. *Id.* at 1870–71.

On December 4, 2006, the Army moved to strike plaintiff's assertion of an ambiguity in the Solicitation as an "untimely supplemental protest ground," and argued that the supplemental ground "should be dismissed." *Id.* at 1889. The Army argued that, although plaintiff had received a one-day extension to file its comments, under GAO bid protest regulations, supplemental grounds of protest must be filed within ten days of the time that the basis of the

---

[2] In the Source Selection Decision, the CCE-ACA determined that Evolver's "Excellent" rating on technical capability justified paying a premium over Serrato Corporation's bid, because Serrato Corporation only received a "Good" rating in technical capability. AR 1734.

protest was or should have been known. The Army asserted that plaintiff had actual notice of the basis of its supplemental protest on November 17, 2006. "Thus, according to the Bid Protest Regulations, any supplemental grounds of protest had to be filed on or before November 27, 2006. . . . However, [plaintiff] did not raise these supplemental allegations until November 28, 2006—which is one day late." *Id.* at 1890.

On December 8, 2006, the GAO dismissed plaintiff's protest on the ground that plaintiff had not satisfied GAO timeliness requirements in raising its argument addressing the interpretation of the 75 percent requirement. *Id.* at 1900–02. On December 21, 2006, plaintiff requested that the GAO reconsider its decision. *Id.* at 1906. On February 6, 2007, the GAO denied plaintiff's request for reconsideration. *Id.* at 1936. On March 8, 2007, plaintiff filed its complaint in this Court. Pl.'s Mot. 1.

## ***ANALYSIS***

### I. Jurisdiction

Pursuant to the Tucker Act, 28 U.S.C. § 1491(b) (2000), the United States Court of Federal Claims has jurisdiction over post-award bid protest cases.[3] The Tucker Act grants the Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The Tucker Act further permits the Court to "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." *Id.* § 1491(b)(2).

### II. Standard of Review

Pursuant to the Tucker Act, this Court reviews the challenged agency action under the Administrative Procedure Act ("APA") standards set forth in 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4); *see also Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) . . . ."). Under the APA standards, an agency action will be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or if it is "without observance of

---

[3] Section 12 of the Administrative Dispute Resolution Act of 1996 ("ADRA") gave the Court of Federal Claims jurisdiction over bid protest cases. Pub. L. No. 104-320, 110 Stat. 3870, 3874–76 (1996). Although initially both the Court of Federal Claims and the district courts had concurrent jurisdiction over bid protests, under the ADRA the district courts' jurisdiction was to terminate on January 1, 2001, unless extended by Congress. ADRA § 12(d). Congress did not renew the bid protest jurisdiction of the district courts, so the Court of Federal Claims has become the exclusive judicial forum for bid protest cases.

procedure required by law." *Id.* § 706(2)(D). In other words, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

"The arbitrary and capricious standard . . . is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). If an award is challenged on the ground that the procurement official's decision lacked a rational basis, the Court must determine whether the agency provided a "coherent and reasonable explanation of its exercise of discretion," *Impresa Construzioni*, 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)), and plaintiff bears the "heavy burden" of demonstrating that the award had no rational basis. *Id.* (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)). Where, as here, plaintiff challenges the solicitation on the ground that it was in violation of regulation or procedure, plaintiff must show a "clear and prejudicial violation of applicable statutes or regulations." *Id.* (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). In making its determination, the Court "is not empowered to substitute its judgment for that of the agency." *Emerald Coast Finest Produce Co., Inc. v. United States*, 75 Fed. Cl. 549, 554 (2007) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974)).

In determining whether the agency decision was arbitrary or capricious, the Court evaluates four factors: whether "(1) there was subjective bad faith on the part of the procuring officials; (2) there was a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated." *United Int'l Investigative Servs. v. United States,* 41 Fed. Cl. 312, 318 (1998) (citing *Keco Indus., Inc. v. United States*, 203 Ct. Cl. 566, 574, 492 F.2d 1200, 1203 (1974)). There is, however, no "requirement or implication . . . that each of the factors must be present in order to establish arbitrary and capricious action by the government." *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir. 1988).

In order to overturn the agency decision, it is insufficient for plaintiff merely to establish that the CCE-ACA's action lacked a rational basis or violated a regulation or procedure. To prevail, plaintiff also bears the burden of showing "a significant, prejudicial error in the procurement process." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999). In order to show it was significantly prejudiced, plaintiff does not have to show that, but for the error, plaintiff would have been awarded the contract. *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir. 1996). Rather, "[t]o establish 'significant prejudice' [plaintiff] must show that there was a 'substantial chance' it would have received the contract award" absent the challenged agency action. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005) (citing *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). Where plaintiff demonstrates that the contracting officer's rationale for rejecting the

bid was unreasonable and that plaintiff was prejudiced as a result of the rejection, "the contracting officer's decision will not stand." *Hawaiian Dredging Constr. Co. v. United States*, 59 Fed. Cl. 305, 316 (2004).

## III. Discussion

The Government asserts that plaintiff's proposal failed to comply with the requirements of the Solicitation. Def.'s Cross-Mot. 18–19.[4] Its failure, according to the Government, was two-fold: (1) plaintiff failed to provide a Loaded Unit Price for each labor category, and (2) plaintiff failed to bid on at least 75 percent of the installations in each region on which it bid. *Id.* Plaintiff responds that its proposal met the unambiguous requirements of the Solicitation. According to plaintiff, because the Solicitation did not require offerors to propose performance on each service category at each installation, it clearly did not require offerors to provide a Loaded Unit Price for each labor category. Pl.'s Reply 18–21. Furthermore, plaintiff argues, the Solicitation's requirement that offerors bid on at least 75 percent of services within a region meant that offerors were to bid on at least 75 percent of the estimated hours provided by the Government, not of the installations in a region. *Id.* at 21–24. In order to prevail, plaintiff must demonstrate that it was correct on both points.

### A. Plaintiff's Protest Was Not Untimely, Nor Was It Barred By the Doctrine of Laches

Defendant and Dynamic argue that the Court should dismiss plaintiff's bid protest because it is untimely. Def.'s Cross-Mot. 15–17; Dynamic's Cross-Mot. 10–12. They argue that plaintiff had a duty to seek clarification of the provisions of the Solicitation it now calls ambiguous[5] and, failing to receive satisfactory clarification, had a duty to file a protest before the

---

[4] The Government argues that *Lockheed Martin IR Imagining Sys., Inc. v. West*, 108 F.3d 319, 323 (Fed. Cir. 1997) stands for the proposition that, in this case, the CCE-ACA was forbidden from considering any proposal that did not comply with the requirements of the solicitation. Def.'s Cross-Mot. 19. *Lockheed Martin* deals, however, with sealed bidding, governed by 48 C.F.R. § 14.103-2(d). *Lockheed Martin*, 108 F.3d at 323. The Solicitation was governed by Part 15 and Part 16.5, rather than Part 14, of the Federal Acquisition Regulations ("FAR"). The Government did not point out, and the Court was unable to find, any analogous requirement that proposals comply with the requirements of a solicitation in Part 15 or Part 16.5 of FAR. In any event, in this case plaintiff contends that its proposal did, in fact, comply with the Solicitation and, if it did not, that the fault was the Government's in failing to comply with FAR 15.304(d).

[5] Plaintiff maintains that the Solicitation was unambiguous and that plaintiff interpreted the Solicitation correctly. Pl.'s Reply 26 ("In support of their ambiguity argument, the Defendants contend that HOA concedes the Solicitation is ambiguous. This is not true. HOA has always taken the position that the Solicitation clearly instructs offerors to prepare their

deadline for the filing of proposals or, at the latest, before the award of the contract. Def.'s Cross-Mot. 15; Dynamic's Cross-Mot. 10–11.

The timeliness requirement proposed by defendant is based "not on this court's jurisdictional statutes or rules, but those of the GAO." *WIT Assocs. v. United States*, 62 Fed. Cl. 657, 661 (2004). Under GAO rules, "[p]rotests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for receipt of initial proposals shall be filed prior to bid opening or the time set for receipt of initial proposals." 4 C.F.R. § 21.2(a)(1).[6] While this Court has discretion to employ the GAO's timeliness requirements, *see, e.g.*, *N.C. Div. of Servs. for the Blind v. United States*, 53 Fed. Cl. 147, 165 (2002), "there is no clear mandate in the caselaw for the imposition of GAO timeliness deadlines with respect to cases before this court." *Consol. Eng'g Servs. v. United States*, 64 Fed. Cl. 617, 624 (2005). Neither defendant nor the intervenors have demonstrated why, in this case, "a GAO rule that self-limits that agency's advisory role constitutes a limit, either legally or prudentially, on this court's exercise of jurisdiction." *WIT Assocs.*, 62 Fed. Cl. at 661 (quoting *Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533, 535 (2003)). The Court therefore declines to dismiss plaintiff's bid protest on the ground it was untimely.[7]

---

proposals as did HOA here."). Plaintiff argues "solely" in the alternative that there was a latent ambiguity in the Solicitation. *Id.*

[6] The FAR contains a similar timeliness requirement for filing agency protests: "Protests based on alleged apparent improprieties in a solicitation shall be filed before bid opening or the closing date for receipt of proposals." FAR 33.103(e). Both an agency and the GAO may hear an untimely protest, however, "for good cause shown" or where such protest "raises issues significant" to the procurement system. *Id.*; 4 C.F.R. § 21.2(c).

[7] The parties expended significant effort briefing the question whether the Solicitation was ambiguous and, if it was, whether the ambiguity was patent, casting upon plaintiff a duty to obtain clarification, or latent, to be read against the Government as drafter. *See, e.g.*, Def.'s Cross-Mot. 19–26; Dynamic's Cross-Mot. 18–21; Evolver's Cross-Mot. 12–14; Pl.'s Reply 25–27. The question of ambiguity is relevant in the context of the GAO timeliness requirements, which do not bind this Court. *See* Section III.A, *supra*. To the extent the issue of ambiguity has any further relevance in this case, the Court finds that, if the language of the Solicitation was ambiguous, plaintiff's interpretation fell within the "zone of reasonableness." *NVT Techs., Inc. v. United States*, 54 Fed. Cl. 330, 335 (2002) (quoting *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999)). The ambiguity did not, however, rise to the level of "an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap," *Jaynes v. United States*, 75 Fed. Cl. 218, 235 (2007) (quoting *WPC Enters. v. United States*, 163 Ct. Cl. 1, 6, 323 F.2d 874, 876 (Ct. Cl. 1963)), and did not, therefore, rise to the level of a patent ambiguity, relieving plaintiff of any duty of inquiry. *See* Sections III.B.1 and III.B.2, *infra*.

Defendant and Dynamic also argue that the doctrine of laches should bar plaintiff from pursuing its bid protest. Def.'s Cross-Mot. 18; Dynamic's Cross-Mot. 12. The affirmative defense of laches requires defendants to show: "(1) unreasonable and unexcused delay by the claimant, and (2) prejudice to the other party, either economic prejudice or 'defense prejudice.'" *Software Testing*, 58 Fed. Cl. at 536 (quoting *Jana, Inc. v. United States*, 936 F.2d 1265, 1269 (Fed. Cir. 1991)). Dynamic asserts that laches applies because "plaintiff waited too long to raise these allegations," Dynamic's Cross-Mot. 12, and the Government further asserts that plaintiff "failed to challenge alleged ambiguities at a critical time." Def.'s Cross-Mot. 18. Plaintiff replies that it has "pursued its protest diligently." Pl.'s Reply 36. Plaintiff filed its agency protest three days after receiving its debriefing, *id.*, and three days after that submitted a protest to the GAO. *Id.* at 37. It requested a reconsideration of the GAO's denial of its protest thirteen days after the denial. *Id.* Six weeks later, the GAO denied reconsideration, and fewer than thirty days after the GAO's denial, plaintiff filed this action. *Id.* Although it has taken time to arrive at this Court, plaintiff appears to have taken every step on its bid protest journey in a timely manner. The Court finds no unreasonable or unexcused delay on the part of plaintiff. Therefore, the Court finds no grounds for barring plaintiff's action under the doctrine of laches.

B. The CCE-ACA's Decision to Reject Plaintiff's Bid Was Contrary to Regulation and Must Therefore Be Set Aside

Plaintiff alleges that the CCE-ACA's selection process violated FAR 15.302, 15.303, 15.304, 15.308, and 15.506, Pl.'s Reply 34, without explaining how the selection process implicated, much less violated, those provisions. Nonetheless, the Court has evaluated the CCE-ACA's selection process in light of those FAR provisions. The Court presumes that plaintiff asserts that intervenors' proposals did not represent "best value," as required by FAR 15.302 and 15.303(b)(6). Further, plaintiff seems to assert that the CCE-ACA's action violated FAR 15.506(a)(2) because plaintiff did not receive a debriefing until eighteen days after it requested the debriefing. *See* Pl.'s Reply 14. Finally, the Court understands plaintiff to argue that the factors and significant subfactors to be used in evaluating the proposals were not stated clearly in the Solicitation, in violation of FAR 15.304(d).[8]

---

[8] The Court cannot determine in what way, if any, plaintiff believes the selection process violated FAR 15.308, which states:

> The source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

It is not clear that the CCE-ACA violated the regulatory mandate to select the proposal that presented the best value.  The Special Instructions to the Solicitation state that:

> Best Value will be based on an integrated assessment by the source selection authority of the results of the evaluation of all areas and factors set forth herein with due consideration to the relative order of importance.  Accordingly, the Government may award any resulting contracts to other than the offerors proposing the lowest price or other than the offerors achieving the highest adjectival rating.

AR 375.  Although plaintiff's adjectival rating was as high as that of Dynamic and Evolver and plaintiff offered the lowest price on two regions on which it bid (and the second-lowest on a third) it is not clear that these facts are sufficient to show that plaintiff provided the best value, according to the terms of the Solicitation.  Therefore, plaintiff has not demonstrated a clear violation of FAR 15.302 or FAR 15.303(b)(6).

Similarly, although the regulations provide that, "*[t]o the extent practicable*, the debriefing should occur within 5 days after the receipt of the written request," FAR 15.506(a)(2) (emphasis added), they do not require that debriefing occur within five days.  Plaintiff has not explained how, in light of the qualification provided by the first clause, the Government's delay in providing the debriefing slides violated FAR 15.506(a)(2).

However, there is no qualification on the requirement of FAR 15.304 that "[a]ll factors and significant subfactors that will affect contract award . . . shall be stated clearly in the solicitation."  FAR 15.304(d).  For the reasons set forth below, plaintiff has met its burden of demonstrating both that the requirement that offerors bid on at least 75 percent of the services and the requirement that offerors enter a loaded unit price in each blank on Attachment B.1 were not stated clearly in the Solicitation, and thus that there was a clear violation of an applicable regulation.

        1.       <u>The Government's Intention That Offerors Bid on at Least 75 Percent of Services Was Not Stated Clearly in the Solicitation</u>

The Solicitation requires that, in order to be considered for award, "offerors must submit a proposal for no less than 75% of the services within a region listed in Technical Exhibit 4, Workload Estimates."  AR 375.  Various offerors asked questions seeking clarification of the 75 percent standard, and the CCE-ACA repeated "75% of the services within a region" like a mantra, without any explanation that the CCE-ACA intended "services" to mean "installations."  *See* AR 368, 417, 419, 422, 423; *see also* Transcript of Proceedings held on May 7, 2007 ("Tr.," docket entry 44) 23:16–25.

Plaintiff understood the Solicitation to require that an offeror submit a proposal to perform at least 75 percent of the estimated labor hours within any region on which it wanted to

bid. Pl.'s Reply 21. The Government, on the other hand, avers that it intended for offerors to "bid on 75 percent of the installations in each geographic region." Def.'s Cross-Mot. 23.

Dynamic asserts that there was nothing in the Solicitation to suggest that "services" was to equate with "hours." Dynamic's Cross-Mot. 19. Although true, there is likewise no definition within the Solicitation equating "services" and "installations," as the Government and intervenors would have this Court hold.[9] The CCE-ACA disqualified plaintiff's bid because, in its view, plaintiff did not meet this 75 percent requirement, demonstrating that this was a significant factor in awarding the contract. That both plaintiff's and defendants' interpretations of the Solicitation are supportable, in spite of the fact that their interpretations are radically different, demonstrates that what the CCE-ACA intended the 75 percent requirement to mean was not clear in the Solicitation, in contravention of FAR 15.304(d).

2. <u>The Government's Intention That Offerors Include a Loaded Unit Price For Each Service Category on Attachment B.1Was Not Stated Clearly in the Solicitation</u>

Defendant and Dynamic assert that plaintiff's bid was properly dismissed because plaintiff failed to enter on Attachment B.1 a loaded unit price for each labor category in every region on which it bid. Def.'s Cross-Mot. 20–23; Dynamic's Cross-Mot. 14–15. Instead, plaintiff only entered a loaded unit price for the services for which the CCE-ACA had supplied an estimated workload of more than zero hours. *See* AR 540–43, 545; *see also* Pl.'s Reply 18–21; Def.'s Cross-Mot. 20–22; Dynamic's Cross-Mot. 14–15. Defendant and Dynamic point out, in support of their argument, that each page in Attachment B.1 includes the caption: "OFFEROR SHALL ENTER LOADED UNIT PRICES FOR EACH LABOR CATEGORY." AR 1772–80.

However, the Special Instructions to the Solicitation explain how offerors are to fill out Attachment B.1. The instructions state,

> The Offeror will submit a separate and distinct Price Proposal *by utilizing Technical Exhibit 3* . . . to enter Indefinite Delivery-Indefinite Quantity type contract loaded

---

[9] Dynamic also argues that plaintiff's interpretation is unreasonable because "[n]one of the awardees equated 'services' with 'hours.'" Dynamic's Cross-Mot. 19. Evolver goes further, claiming that "[o]f the 12 [sic] offerors, all of the others seem to have understood the [75 percent] requirement." Evolver's Cross-Mot. 13. Evolver's assertion, however, is unsupported by the Administrative Record and, although Dynamic is correct that the *awardees* all interpreted the Solicitation in the same way, that argument is less than overwhelming—the Administrative Record includes only the offers of the intervenors and of plaintiff. It does not disclose whether the remaining ten offerors favored plaintiff's or defendants' interpretation, or some other interpretation altogether.

> fixed hourly rates for the labor required at each installation into [Attachment B.1]. [Attachment B.1] will then be utilized to complete Section B . . . .

AR 375 (emphasis added). "It is well settled that the task of construing the terms of a government solicitation essentially involves contract interpretation, and therefore presents issues of law to be determined by the court. Indeed, the principles governing contract interpretation apply with equal force to the interpretation of government issued solicitations." *Rotech Healthcare, Inc. v. United States*, 71 Fed. Cl. 393, 424 (2006) (citations omitted).

In interpreting a contract (and, by extension, the Solicitation), the document should be construed in such a way as to best give meaning to all of its provisions, so that no provision is rendered superfluous. *First Nationwide Bank v. United States*, 431 F.3d 1342, 1347 (Fed. Cir. 2005); *Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 395, 351 F.2d 972, 979 (1965). The Special Instructions clearly state that offerors should utilize Technical Exhibit 3 in filling out Attachment B.1. Technical Exhibit 3 is a table with one page per region, the vertical axis of which lists the installations in each region, and the horizontal axis of which lists the eleven support services. To this extent, it is nearly identical to Attachment B.1, on which the vertical axis lists the installations in each region, while the horizontal axis lists the "Unit Price Per Hour" for each of the eleven support services. *Compare, e.g.*, AR 1764 *with* AR 1772. In Technical Exhibit 3, however, the CCE-ACA had filled the tables in with an estimate of the hours that it believed it would require for each service at each installation, *id.* at 1764–71, while the tables in Attachment B.1 were blank, permitting the offerors to fill them in. *Id.* at 1772–80.

Defendants argue that the purpose of referring offerors to Technical Exhibit 3 in order to fill out Attachment B.1 was so that offerors would know which installations were in each region, and which services were to be provided at each installation. Tr. 41:2–10. However, as plaintiff pointed out at oral argument, that same information is available on Attachment B.1 itself. *See id.* at 77:23–78:12. If the CCE-ACA intended for offerors to fill in all the blanks on Attachment B.1, it did not need to tell them to utilize Technical Exhibit 3; offerors had all the information they needed to complete Attachment B.1 without any additional clarification. If Technical Exhibit 3 failed to add information to that provided by Attachment B.1, the Special Instruction regarding the use of Technical Exhibit 3 would be rendered superfluous.

Because the only information Technical Exhibit 3 contains that Attachment B.1 does not is the CCE-ACA's workload estimate, it was reasonable for plaintiff to understand that it was to fill in fully loaded hourly rates only in blanks relating to those services for which the Army had provided an estimated number of hours. Under that interpretation, the instruction that offerors were to utilize Technical Exhibit 3 in order to fill out Attachment B.1 was not rendered superfluous, and every term of the Solicitation had meaning.

In response to defendants' argument that the language "OFFEROR SHALL ENTER LOADED UNIT PRICES FOR EACH LABOR CATEGORY" unambiguously required offerors to complete Attachment B.1 in its entirety, plaintiff responds that, because it follows the Special

Instruction directing offerors to utilize Technical Exhibit 3, that language could not mean offerors were to fill in all the blanks on Attachment B.1. The more reasonable understanding of the language, then, would be that it was intended to instruct offerors to enter "loaded unit prices," as opposed to a different type of unit price. Pl.'s Reply 21. Furthermore, plaintiff argues, any assertion that the language in question was intended to require offerors to supply fully loaded hourly rates for every service was belied by the Government's response to question 33 of the set of Contractor Question[s] and Government Response[s] of August 4, 2006. Question 33 and the Government's response were as follows:

> 33. Do you want vendors to provide a fully burdened hourly rate for every labor category, and every site? In other words, Attachment B.1 would be completed in its entirety, and submitted as part of the Price Proposal.
> ***No. Vendors do not have to submit a bid on every region.***

AR 368 (emphasis in original). Plaintiff asserts that the Government's response of "No" indicates clearly that it was not required to complete Attachment B.1 in its entirety. Plaintiff puts emphasis on the fact there are two sentences (the first of which consists of one word: "No."), separated by a period rather than a comma, to support its position. Tr. 71:3–73:9. The Court does not read the response as strongly in plaintiff's favor as plaintiff proposes; although there may be two sentences separated by a period, both sentences are in response to the question, and the word "No" is modified by the second sentence. It seems to the Court, in context, that the answer in its entirety is unresponsive to the question, and helps neither plaintiff's nor defendants' position.

Irrespective of the Government's arguably incorrect (or at least misleading) answer to question 33, however, plaintiff has demonstrated that the Solicitation was unclear and hence violated FAR 15.304(d) in attempting to state the requirement that a loaded unit price had to be entered for each labor category on Attachment B.1.

3. Plaintiff Has Shown That It Was Prejudiced by the Lack of Clarity of the Solicitation

Having found that the Solicitation was unclear and hence contrary to FAR 15.304(d), the Court must evaluate whether the violation of regulation "significantly prejudiced" plaintiff. *Bannum*, 404 F.3d at 1353 (citing *Alfa Laval*, 175 F.3d at 1367). "To prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996)). To establish prejudice, plaintiff must show that there was a "substantial chance it would have received the contract award but for" the errors in the procurement process, *id.* at 1358 (citing *Info. Tech.*, 316 F.3d at 1319), a more-lenient test than showing that, but for the errors, plaintiff would have won the contract. *Id.* (citing *Alfa Laval*, 175 F.3d at 1367).

The Government urges that the Court find plaintiff was not prejudiced in spite of the lack of clarity of the Solicitation because, it alleges, in an apples-to-apples comparison, plaintiff failed to supply the lowest bid in the Northwest, Pacific, or Southwest region. Def.'s Cross-Mot. 27–28. The Government calculated roughly the prices it asserted intervenors would have offered, based on the loaded unit prices supplied in their proposals, had they submitted proposals to supply services only at the same installations plaintiff did. The Government asserts that (1) in the Northwest Region, Evolver would have bid * * * compared with plaintiff's bid of * * *; (2) in the Pacific region, Evolver would have bid * * * as opposed to plaintiff's bid of * * *; and (3) in the Southwest region, Dynamic would have bid * * * compared with plaintiff's bid of * * *. *Id.* In each case, the intervenor's bid would have been lower than plaintiff's.

Plaintiff replies that, had intervenors submitted proposals to supply a lesser volume of services, their unit prices would likely have been higher and, conversely, had plaintiff submitted proposals to supply a higher volume of services, its unit prices would likely have been lower, making the Government's putative comparison meaningless. In plaintiff's view, the Government compared apples to oranges (*i.e.*, it compared the unit prices actually proposed by plaintiff with unit prices calculated by applying intervenors' higher-volume proposed unit prices to a lower volume of services). Pl.'s Reply 31.

As the Government and intervenors point out, overall price was not the only, or even the most important, factor in evaluating the proposals. *See* Def.'s Cross-Mot. 26 ("Heritage's argument that it should have been awarded the contract because it provided the lowest price ignores the reality—clear in the solicitation—that 'other cost factors' exist in a 'best value procurement.'"); Dynamic's Cross-Mot. 23 ("Furthermore, the fact that HOA offered lower prices is unavailing, considering it proposed providing fewer services than those potentially required."); Evolver's Cross-Mot. 10 ("Moreover, even if Plaintiff legitimately was the low bidder for Regions 3 or 5, there is nothing that Plaintiff can point to which would suggest that Evolver or [Dynamic], respectively, would not have been awarded the contract on the basis of quality, as Evolver was with Region 6."). "[W]hile price differential may be taken into account, it is not solely dispositive; [a court] must consider all the surrounding circumstances in determining whether there was a substantial chance that a protester would have received an award but for a significant error in the procurement process." *Alfa Laval*, 175 F.3d at 1368.

In the Source Selection Decision, Jacqueline C. Woodson, the Source Selection Authority, after determining that plaintiff and intervenors each were rated Excellent on non-price factors, AR 1732, and received a rating of Low Risk under past performance, *id.* at 1733, disqualified plaintiff for failure to propose on various labor categories and failure to propose on at least 75 percent of installations in a region. *Id.* Therefore, Ms. Woodson did not include plaintiff as she evaluated the proposals in relation to "total cost and other factors." *Id.*[10]

[10] The Government disagrees that plaintiff's proposals were not included in the evaluation of proposals, basing its conclusion on the fact that, in the paragraph following Ms. Woodson's disqualification of plaintiff, she mentions plaintiff's "high tech proposal" as being substantially

Defendant and intervenors are correct that plaintiff has not shown that it would have received the contracts to perform ACES support services in the Northwest, Pacific, and Southwest regions absent the Solicitation's lack of clarity. However, plaintiff has demonstrated that it would have been within the "zone of consideration for a contractual award." *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 208 (2004). The only reason plaintiff's proposal was not considered by the Source Selection Authority was that she considered the proposal to be noncompliant with the Solicitation. Furthermore, although the Government contends that plaintiff's proposals for the Northwest, Pacific, and Southwest regions proposed higher unit prices than the respective intervenors' proposals as adjusted by the Government (*see* p. 14 *supra*), the Court has calculated that plaintiff's proposal for the Northwest Region was * * * than the Government's calculation of what Evolver would have offered, plaintiff's proposal for the Pacific Region was * * * than the Government's calculation of what Evolver would have offered, and in the Southwest Region, plaintiff's proposal was * * * than what the Government calculated Dynamic would have offered. Plaintiff's adjectival ratings on technical capability and past performance were equal to intervenors' and its price proposals were very close to intervenors' as adjusted by the Government. The Court finds that plaintiff has met its burden of demonstrating that, but for the lack of clarity of the Solicitation in violation of FAR 15.304(d), it would have been within the zone of consideration for award. Accordingly, the Court concludes that plaintiff was prejudiced by defendant's failure to comply with FAR 15.304(d).

C. Plaintiff is Entitled to Tailored Injunctive Relief

Having found that plaintiff has shown a "clear and prejudicial violation of applicable . . . regulations," *Impresa Construzioni*, 238 F.3d at 1333 (quoting *Kentron*, 480 F.2d at 1169), the Court must now consider whether equitable relief is warranted. A permanent injunction is an "extraordinary remedy," *KSD, Inc. v. United States,* 72 Fed. Cl. 236, 267 (2006), and the Federal Circuit has held that, in deciding whether to issue a permanent injunction, this Court should consider: "(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987)).

---

equal to a number of other such proposals. Tr. 89:15–95:9; AR 1733. The Court, however, having carefully reviewed the AR, finds that the inclusion of plaintiff in the paragraph in question was inadvertant; at the end of the disqualification paragraph, Ms. Woodson listed the lowest-price proposals by region, and did not include plaintiff, although plaintiff's proposal clearly offered the lowest price for two regions. This indicates that, once she had determined that plaintiff's bid was noncompliant with the Solicitation as she understood it, she no longer considered plaintiff's proposal in her best value analysis.

Plaintiff has already established its entitlement to prevail on the merits. In order to determine whether to grant injunctive relief, then, the Court must consider the other three factors, namely irreparable harm, balance of the hardships, and public interest. Of the four factors, "no single factor is dispositive because 'the weakness of the showing regarding one factor may be overborne by the strength of others.'" *IDEA Int'l, Inc. v. United States*, 74 Fed. Cl. 129, 141 (2006) (quoting *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir.1993)); *see also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (discussing relationship among criteria for preliminary injunction).

1. Irreparable Harm

"A party suffers irreparable harm when there is no adequate remedy at law." *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 575 (2004) (citing *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000)). The Court understands that "mere loss of money does not qualify as irreparable harm if the party can be made whole through money damages." *Hawaiian Dredging*, 59 Fed. Cl. at 317. However, where, as here, plaintiff has no action against the United States for lost profits, the harm to plaintiff is irreparable and that harm satisfies the second criterion for injunctive relief. *Id.*; *see also Wash. Metro.*, 559 F.2d at 843 n.2 (temporary monetary losses for which "adequate compensatory or other corrective relief will be available at a later date" are insufficient to warrant preliminary injunction) (quoting *Va. Petroleum Jobbers Assoc. v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)). In addition, the failure of an offeror to have its proposal "fairly and lawfully considered constitutes irreparable injury." *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 370 (2004) (citing *Overstreet Elec.*, 47 Fed. Cl. at 744 n.25).

The Government argues that plaintiff's "allegations of irreparable harm are belied by the leisurely pace at which it has pursued this protest." Def.'s Cross-Mot. 30. However, as discussed at Section III.A, *supra*, plaintiff has pursued its claims diligently and in a timely manner. Thus, the Court declines to draw any inference adverse to plaintiff on the issue of irreparable harm based on the timing of plaintiff's efforts to set aside the Government's action.

In this case, as discussed in Sections III.B.1 and III.B.2, *supra*, plaintiff's proposal was not fairly and lawfully considered. In addition, without equitable relief, plaintiff will be deprived of the profits it would otherwise have had a substantial chance of earning under the contracts to supply educational support services in the three regions in question. The Court finds, therefore, that without injunctive relief plaintiff will suffer irreparable harm.

2. Balance of Hardships

"Under this factor, the court must consider whether the balance of hardships leans in the plaintiff's favor. This requires a consideration of the harm to the government and to the intervening defendant[s]." *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715 (2006). The Government asserts that "granting an injunction . . . requiring the awardees to cease

performance will have an immediate and substantial detrimental affect [sic] on the Army and its personnel." Def.'s Cross-Mot. 29. Given the importance of the ACES program, the Government asserts, any interruption would hurt the morale, recruitment, and retention of soldiers. *Id.* Furthermore, if the contracts were cancelled, the Government would be required to reimburse intervenors for their allowable costs incurred in performance of the contracts thus far, as well as for additional amounts that would be due by reason of the early termination of their contracts. Evolver's Cross-Mot. 21.

Moreover, the intervenors would be harmed if enjoined from performing under their contracts. Intervenors commenced performance on their respective contracts on October 1, 2006, and have continued to perform through the present. *Id.* at 7. They have expended money in start-up costs, and have "recruited, trained, placed, and maintained a staff." *Id.* at 21.

Plaintiff has responded to these legitimate concerns by proposing that this Court tailor the terms of any injunctive relief in such a way as to minimize the hardship to the Government, intervenors, and Army personnel. In that regard, plaintiff suggests that rather than immediately enjoining performance under the existing contracts, this Court should enjoin the Government from exercising its options to continue performance under intervenors' contracts in the Northwest, Pacific, and Southwest regions and require the Government to conduct a resolicitation for the provision of ACES support services in those three regions for the period beginning at the end of the base year. Pl.'s Reply 41.

Such tailored relief has been approved by this court where the plaintiff in a bid protest case has been found to have been prejudiced by wrongful agency action, but where it is not clear that, absent the wrongful conduct, the plaintiff would have received the contract. *See, e.g.*, *Seattle Sec. Servs. v. United States*, 45 Fed. Cl. 560, 572 (1999); *United Int'l*, 41 Fed. Cl. at 324; *see also IDEA Int'l*, 74 Fed. Cl. at 131 n.4.

The Court recognizes that even such tailored injunctive relief would not be without costs to the Government, to intervenors, and to the beneficiaries of the support services in question. The Government concedes that such relief is "a better solution than an immediate cessation of performance," but asserts that even a resolicitation for the provision of ACES support services in what are the option years under intervenors' current contracts will result in some disruption of services. Def.'s Reply 10. The Government further asserts that, in spite of its right to permit the contracts to expire by their terms after one year, it is by no means clear that the Government intended to do so. *Id.* The resolicitation will take time and cost money. However, the fact that the Government foresaw the possibility of resoliciting the contracts after one year tends to mitigate such objections. Had the harm to all concerned of the Government's declining to exercise the options after the base year been too burdensome, it could have sought proposals for five-year contracts without options for additional years, rather than proposals for a base year and four option years.

Similarly, although intervenors would be required to incur the expense of competing again for the contracts, such a possibility was foreseeable when they entered into the existing contracts. Intervenors could not take for granted or assume that the Government would exercise its options to continue performance by intervenors during the option years. The possibility of tailored relief permitting the Government and intervenors to continue performance through the end of the base year, enjoining the Government from exercising its options and requiring a resolicitation of the contracts to provide services in years 2–5, ameliorates the harms to all concerned and, in the Court's view, causes the balance of harms to tilt in favor of granting such tailored injunctive relief.

The base year under the existing contracts terminates on September 30, 2007, AR 266, and the Court believes that, given the date of issuance of this Opinion and Order, the CCE-ACA will have the necessary lead time to conduct a resolicitation for ACES support services in the Northwest, Pacific, and Southwest regions and make awards in time for the awardees to commence performance immediately after September 30, 2007. *See, e.g.*, Tr. 62:16–24. Based upon the record before this Court, it appears that the CCE-ACA will have ample time to properly resolicit the ACES support services it needs. The changes to the prior Solicitation necessary to clarify its intent appear to the Court to be relatively straightforward. The CCE-ACA initially issued the Solicitation on June 26, 2006, over three months before the contracts were to begin. It then issued an amendment replacing the Solicitation in its entirety on August 4, 2006, just under two months before the contracts were to begin. The final amendment to the Solicitation was issued August 17, 2006, and the awardees were informed of their having been selected in mid-September. Thus, if the CCE-ACA were to immediately begin work on the relatively straight-forward changes necessary to conform the new solicitation to applicable regulations and procedures and were in a position to issue a revised solicitation in a month, it would have three months to receive and evaluate proposals before the awardees would need to commence performance in order to avoid any interruption in the provision of ACES support services. If the CCE-ACA took two months to issue the revised solicitation, offerors would still have more time to submit their proposals than they did between the first amendment to the Solicitation and the start date of performance under the existing contracts.

3. Public Interest

"The public interest is served by ensuring a procurement process conforms to applicable procurement regulations." *Hawaiian Dredging*, 59 Fed. Cl. at 317; *see also Parcel 49C Ltd. Partnership v. United States*, 31 F.3d 1147, 1152 (Fed. Cir. 1994). Because the procurement process at issue in this case did not conform to the requirements of the FAR, it is in the public interest to take action to redo the flawed procurement and, in doing so, correct the errors that occurred in the initial procurement process. To be sure, there is a countervailing public interest in minimizing disruption of the ACES program, and thereby minimizing harm to Army personnel enrolled in the ACES program. That interest is served, however, by the reduced level of disruption that would be occasioned by the tailored relief and prompt resolicitation discussed in Section III.C.2, *supra*, as compared to immediately enjoining performance under the existing

contracts. The public interest in minimizing disruption to the ACES program is thus accommodated to the degree that any remaining harm to that interest is outweighed, in the Court's view, by the public's interest in a procurement process that conforms to applicable regulations and procedures.

## *CONCLUSION*

Having determined that CCE-ACA's determination not to consider plaintiff's proposal for alleged failure to comply with the terms of the Solicitation was not in accordance with applicable law and procedures, was prejudicial to plaintiff, and that the public interest and the balance of harms favor granting plaintiff the tailored injunctive relief described above, this Court ORDERS that plaintiff's motion for judgment on the administrative record shall be, and hereby is, GRANTED to the extent set forth herein. The Court FURTHER ORDERS that defendant's and intervenors' cross-motions for judgment on the administrative record shall be, and hereby are, DENIED.

This Court FURTHER ORDERS that the CCE-ACA shall not exercise its options to continue the contracts of Evolver and Dynamic for the Northwest, Pacific, and Southwest regions beyond the end of their base years and that instead the CCE-ACA shall proceed promptly to resolicit contracts for the provision of ACES support services in the Northwest, Pacific, and Southwest regions beginning after September 30, 2007 (*i.e.*, after the end of the existing contracts' base years). Such resolicitation shall be conducted in conformance with applicable regulations and procedures, including, without limitation, FAR 15.304(d).

The Clerk shall enter judgment in favor of plaintiff for the equitable relief described above.

The parties have designated certain information as subject to the protective order (docket entry 10) entered in this action on March 9, 2007. The Court shall therefore initially file this Opinion and Order under seal. The parties shall review the Opinion and Order to determine whether, in their view, any information contained herein should be redacted prior to publication in accordance with the terms of the protective order. The parties shall file, within 14 days of the filing of this Opinion and Order, a joint status report indicating what information, if any, they contend should be redacted and the reasons for such proposed redactions.

IT IS SO ORDERED.

                                        s/ George W. Miller
                                        GEORGE W. MILLER
                                        Judge